E-FILED on     7/24/06

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ELIZABETH WILKERSON,<br><br>Plaintiff,<br><br>v.<br><br>RIFFAGE.COM DISABILITY INCOME PROTECTION PROGRAM, and SUN LIFE ASSURANCE COMPANY OF CANADA,<br><br>Defendants. | No. C-03-04926 RMW<br><br>FINDINGS OF FACT & CONCLUSIONS OF LAW |

This matter was heard before the court on June 6, 2006. Plaintiff Elizabeth Wilkerson asserts that defendant Sun Life Assurance Company of Canada's denial of her claim for long-term disability benefits violated section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. The court now issues its findings of fact and conclusions of law.

## I. FACTUAL BACKGROUND

The facts herein are taken from the administrative record before the plan administrator.[1] The parties "stipulate[d] to admission into evidence of the documents marked WILKERSON 001–574,

---

[1] The court previously determined that the standard of review in this action is *de novo*. Order Determining Standard of Review, docket no. 95. Objections to the declarations Wilkerson presented, docket no. 100, are sustained. Since the court reconsidered its original order on the standard of review and found *de novo* review appropriate, evidence outside the administrative record is not necessarily excluded, but the two declarations offered are irrelevant.

which comprise the administrative record upon which Sun Life relied in making determinations on Plaintiff's claim for benefits and the relevant plan documents." Stipulation to Admission of Evidence at Trial and to Certain Facts ("Stip.") ¶ 1, docket no. 97.

**A. Wilkerson's Condition**

Wilkerson was diagnosed with multiple sclerosis in the early 1980s. Pl.'s Trial Brief at 3; AR[2] 45. By 1998, she was reporting to her physicians weakness and discomfort in her left leg. AR 291, 308. Also in 1998, Annette Langer-Gould, M.D., Wilkerson's neurologist and the Acting Director of the Stanford University Medical Center M.S. Clinic, recommended that Wilkerson work "80 percent time with flexible hours/and or location" due to Wilkerson's "neurological condition." AR 285. From early 1998 to early 1999, Wilkerson saw JoAnn LeMaistre, Ph.D., a psychotherapist specializing in the treatment of patients with multiple sclerosis. AR 59-60.

Wilkerson began working for Riffage.com in May 1999. AR 473. Her title was "Vice President of Business Development" and her job duties included travel and presentations. AR 418-19. At a January 2000 office visit with Dr. Langer-Gould, Wilkerson "appear[ed] quite happy, well adjusted and well informed, as usual." AR 448.

In April 2000, Wilkerson began attending physical therapy sessions (which continued through January 2001). AR 416. Wilkerson also was prescribed an ankle-foot orthotic ("AFO") and also used an ankle brace and cane. AR 418, 448. In January 2000, Dr. Langer-Gould noted that Wilkerson was "reluctant to wear" the AFO "because of its unappealing cosmetic appearance." AR 448. In May 2000, Wilkerson was given a new AFO. AR 414. In September 2000, Dr. Langer-Gould noted that Wilkerson was wearing the AFO on her left foot "all the time." AR 449.

That same month, Wilkerson contacted Dr. LeMaistre seeking treatment for "acute anxiety and depression." AR 59. Dr. LeMaistre saw Wilkerson three times that month and Wilkerson was to "recontact" Dr. LeMaistre for further treatment if necessary. AR 134. In October 2000, Wilkerson's legs became weaker. AR 419. Wilkerson ceased working at Riffage.com on December 8, 2000. AR 475.

---

[2] The court adopts the parties' use of "AR" to refer to the Bates-numbered pages of the administrative record.

In a claim form signed on December 6, 2000, Dr. Langer-Gould indicated that Wilkerson would be able to return to full-time work in two to three months. AR 478. On the same form, Dr. Langer-Gould indicated Wilkerson's "DSM-IV diagnosis" as "Axis I: None," "Axis II: None," and "Axis III: Multiple Sclerosis Exacerbation." AR 478. Dr. Langer-Gould also indicated that Wilkerson had a "slight" mental impairment, indicating that she was "able to function in most stress situations and engage in most interpersonal relationships." AR 478. On January 22, 2001, Dr. Langer-Gould called Sun Life and said that Wilkerson had been disabled since March 2000 but continued to work against medical advice. AR 438.

On January 30, 2001, Wilkerson saw her primary care physician, Jane Lindsay, M.D., complaining that for three months, her left foot had been swelling and had red spots on the sole. AR 92. Dr. Lindsay found Wilkerson's left foot slightly pale and swollen, cold, and suffering from decreased capillary refill. AR 92. Dr. Lindsay referred Wilkerson to Cornelius Olcott IV, M.D., a vascular surgeon. AR 49, 92. Dr. Olcott saw Wilkerson twice in February, once in April, and once in June 2001. AR 5, 93. Oclott's reports to Dr. Lindsay are unremarkable and do not indicate any serious problem with Wilkerson's left foot. *See* AR 105-08, 110-11, 224-26. On Wilkerson's last visit to Dr. Olcott, he noted that her left foot was "warm and pink and free of any evidence of ischemia," though she did report "intermittent episodes of discoloration." AR 106. Dr. Olcott's final diagnosis was "intermittent vasospasm" and he did not recommend any treatment. AR 106. His records do not appear to contain any reference to Wilkerson's AFO. (Wilkerson "also has a foot injury from childhood." AR 45.)

Wilkerson attempted to contact Dr. LeMaistre in late January 2001, but Dr. LeMaistre was on "extended medical leave." AR 59, 135. Wilkerson declined to see the psychologist covering for Dr. LeMaistre, and instead waited for treatment until Dr. LeMaistre returned to work in April 2001. AR 59, 135. Dr. LeMaistre later opined that Wilkerson's waiting to see Dr. LeMaistre was "consistent with her regular and continuing care" because of the energy that would have been required to "start[] over with a new therapist." AR 60.

Wilkerson's first session with Dr. LeMaistre after Wilkerson ceased working was on April 11, 2001. AR 135-36. Dr. LeMaistre noted that Wilkerson "feels flat and appears depressed,"

FINDINGS OF FACT & CONCLUSIONS OF LAW—No. C-03-04926 RMW
JAH                                                          3

1  "never liked being a lawyer," and "does not like the 8-5 rigid aspects of this world."  AR 136.
2  Dr. LeMaistre also wrote, "The theme is absence of motion.  Hard to say how much is depression,
3  how much is disgust with the economic quick fixes of jobs she hates doing, how much stasis results
4  from not being able to say out loud she does not want to do it anymore."  AR 136.  At the next
5  session, Dr. LeMaistre noted Wilkerson's condition may not be "just depression" and could be post-
6  traumatic stress disorder.  *See* AR 136.  Dr. LeMaistre also noted Wilkerson was working on a book;
7  Dr. LeMaistre wrote "FEELS LESS IS MORE IN TERMS OF WORK.  MAYBE PART TIME."
8  AR 136.

9        Notes from sessions from May to September 2001 often indicate that Wilkerson appeared
10 depressed during sessions, though she also updated her résumé, sent her book to an editor, and
11 attended a writers' conference.  AR 136-42.  In September 2001, Dr. LeMaistre and Wilkerson's
12 physicians began considering antidepressant drugs.  AR 140-41.  It appears Wilkerson was
13 prescribed Wellbutrin.  *See* AR 99.  The note from the September 18, 2001 session is the last that
14 appears in the record.  *See* AR 141-42.

15       In a letter to Sun Life dated February 9, 2001, Wilkerson described her reasons for quitting
16 work at Riffage.com as exhaustion brought on by the demands of her job combined with physical
17 weakness caused by multiple sclerosis.  AR 419.  In a phone call, she described her disability as
18 multiple sclerosis combined with her foot problem.  AR 45.

19       Dr. LeMaistre sent Sun Life a letter dated July 17, 2001, which reported that she had seen
20 "Wilkerson intermittently over the past three years for treatment of transient, situationally induced
21 anxiety and depression," that Wilkerson now had "trauma induced depression" that was "moderately
22 severe," and that Wilkerson "needs to find accommodating work."  AR 131-32.  On September 24,
23 2001, Wilkerson told Sun Life that Dr. LeMaistre did not keep any treatment records.  AR 146.
24 However, Sun Life appears to have received Dr. LeMaistre's notes on October 2, 2001.  AR 142; *see*
25 *also* AR 133-41.  Dr. LeMaistre opined in an October 2002 "To Whom It May Concern" letter that
26 "Wilkerson is disabled from all work as a result of the severity of her depression and because of her
27 MS" and that "[t]his disability became this severe in early December, 2000, and has remained at the
28 disabling level since that time."  AR 60.

**B.  Sun Life's Plan**

"Sun Life must receive Notice and Proof of Claim prior to any payment under" the policy. AR 41.  Proof consists of "what the disability is," the date the disability occurred," and "the cause of the disability."  AR 41.  Furthermore, "Proof of Claim includes, but is not limited to Hospital records; Physician records; Psychiatric records; X-rays, narrative reports, or other diagnostic testing materials as required."  AR 41.

The plan contains exclusions, which if applicable, make a beneficiary ineligible to receive benefits even if otherwise entitled to them.  AR 34.  Among the exclusions of the plan at issue are pre-existing conditions.  AR 34 ("No LTD benefit will be payable for any Total or Partial Disability that is due to . . . a Pre-Existing Condition.").  The plan defines "pre-existing conditions" as those for which, *inter alia*, the employee "received medical treatment" in the three months before the employee's insurance under the plan became effective.  AR 34.  The plan also defines "partial disability" as a situation in which "during the Elimination Period and the next 24 months, the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation and the Employee is earning less than 80% of his Indexed Total Monthly Earnings."  AR 18.

The plan contains limitations under which no benefits will be paid, though a beneficiary is eligible for payment after a limitation is no longer applicable.  *See* AR 32.  Among the plan's limitations are (1) periods during which "the Employee is not under the regular and continuing care of a Physician providing appropriate treatment in accordance with the disabling condition," (2) "any period of Total or Partial Disability due to Mental Illness, unless the Employee is under the continuing care of a specialist in psychiatric care," and (3) periods of time "24 months after the Employee completes his Elimination Period," is disabled by mental illness, and is not "confined in a Hospital or Institution licensed to provide psychiatric treatment."  AR 32-33.

June 1, 2000 is the effective date for Riffage.com's long-term disability plan from Sun Life. AR 473.  The three-month period relevant to the exclusion of pre-existing conditions is March 1, 2000 to May 31, 2000.  AR 89.  "[T]he first date benefits could be payable for Plaintiff's claim was March 9, 2001."  Stip. ¶ 2(a).  "[T]he unpaid benefits in dispute are (i) $166,003.78 for the first 24

1  months of Plaintiff's benefits claim from March 9, 2001 through March 8, 2003, and (ii)
2  $446,108.30 for the entirety of Plaintiff's benefits claim from March 9, 2001 through March 31,
3  2006." *Id*. ¶ 2(b).

## II.  CONCLUSIONS OF LAW

1. All ambiguities in the language of Sun Life's long-term disability plan must be resolved in favor of Wilkerson. *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 942 (9th Cir. 1995).

2. Wilkerson's proof of any disability must satisfy an objectively reasonable person in the position of Sun Life. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1088 (9th Cir. 1999) (*en banc*).

3. Wilkerson did not present sufficient proof for a reasonable person in the position of Sun Life to conclude the vasospasm in her left foot was disabling. The letters from Dr. Olcott, the physician treating the condition of Wilkerson's left foot, do not indicate the condition of Wilkerson's left foot was serious or disabling. *See* AR 105-08, 110-11. Wilkerson's claim that Dr. Olcott told her to stop wearing the AFO is, in light of the administrative record, insufficient to prove to a reasonable person in the position of Sun Life that Wilkerson's foot condition was disabling.

4. Wilkerson's proof that her depression was disabling was insufficient to satisfy a reasonable person in the position of Sun Life. Dr. LeMaistre's notes indicate some depression, but not that it was disabling. AR 136-42. Dr. LeMaistre's two letters to Sun Life are in significant aspects inconsistent with her notes and each other, making her letters less credible. *See* AR 131-32, 146. Dr. Langer-Gould did not indicate any incapacitating psychiatric disorder on December 6, 2000, and there does not appear in the record any subsequent mental evaluation by her. *See* AR 478. Although Wilkerson appears to have been prescribed Wellbutrin in September 2001, no records from the prescribing physician appear in the administrative record. AR 99. Nothing in the record shows any psychiatric evaluation of Wilkerson was performed by anyone. The first psychological or mental health examination was by Dr. LeMaistre in 2001 and Dr.

LeMaistre's opinion seems to have been described differently in her notes from that in her letters written on behalf of Wilkerson to Sun Life.

5. Wilkerson's multiple sclerosis is a pre-existing condition under the plan. *See*, *e.g.*, AR 89.

6. Although Wilkerson's multiple sclerosis was fully disabling, it is excluded from coverage under the plan. *See* AR 34.

7. As the vasospasm and depression were not shown to be significant contributors either alone or in combination, the court does not reach Wilkerson's arguments, based on *Patterson v. Hughes Aircraft*, 11 F.3d 948 (9th Cir. 1993), that ambiguous plan language allows her to recover for a total disability caused only partially by a pre-existing condition.[3]

8. Judgment will be in favor of Sun Life and against Wilkerson in accordance with these findings and conclusions.

## III. CONCLUSION

The court, although sympathetic to Wilkerson's situation, concludes on *de novo* review that Sun Life properly denied her claim for long-term disability benefits. Sun Life is entitled to judgment affirming its denial of long-term disability benefits to Wilkerson.

DATED:     7/24/06

*Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge

---

[3] The court finds it does not need to resolve this particular issue in light of the specific policy and the facts as found by the court. Even if Wilkerson's argument that an otherwise-excluded pre-existing condition combined with a substantial new condition that caused her total disability allowed her to recover under Sun Life's plan was correct, her depression and vasospasm were not shown to be substantial.

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff:**

Ronald Glenn Dean           rdean@74erisa.com

**Counsel for Defendants:**

Kathleen Elizabeth Dyer     kdyer@barwol.com
J. Russell Stedman          rstedman@barwol.com
Maria A. Tahmouresie        mtahmouresie@barwol.com

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**     7/24/06                                   /s/ JH
                                                **Chambers of Judge Whyte**